**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
Thomas P. Smith, Jr.
Alison T. Conn
Travis Hill
Elizabeth Butler
Tiantong Wen
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
(212) 336-9135(Hill)
HillTr@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>   Plaintiff,<br><br>-against-<br><br>**THEODORE J. FARNSWORTH,**<br><br>   Defendant. | **COMPLAINT**<br><br>**24 Civ. 9911**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant Theodore J. Farnsworth ("Farnsworth" or "Defendant"), alleges as follows:

**SUMMARY**

1. From at least January 2021 to April 2023 (the "Relevant Period"), Farnsworth defrauded the investing public through material misrepresentations concerning Vinco Ventures, Inc. ("Vinco"), a public company that Farnsworth secretly controlled.

2. In January 2021, Vinco and another Farnsworth-controlled entity, Zash Global Media & Entertainment Corporation ("Zash"), announced that they had entered into a merger

agreement to "creat[e] exciting acceleration and growth in live-streaming content, video-sharing, distribution and production within [the combined Vinco/Zash] ecosystem." According to the January 2021 press release announcing the merger—drafted and approved by Farnsworth—this supposed ecosystem (the "Vinco ecosystem") would combine Vinco's purported proprietary platform with Zash's purported state-of-the art analytics and distribution technology.

3. But that was false. In fact, both of the advertised pillars of the Vinco ecosystem were nonexistent because Vinco did not have a proprietary platform and Zash lacked the claimed analytics and distribution technology.

4. During the Relevant Period, Farnsworth made numerous similar misrepresentations concerning the purported Vinco ecosystem in press releases, Vinco's filings with the Commission, and media appearances.

5. Farnsworth also made, authorized, and/or disseminated false or misleading statements concerning the operations of two affiliated companies that formed critical components of the purported Vinco ecosystem—Lomotif Private Limited ("Lomotif") and AdRizer LLC ("AdRizer")—by exaggerating Lomotif's capabilities, inflating Lomotif's user base, and overstating Vinco's expectations of the revenue Lomotif would generate using AdRizer's social media advertising platform.

6. Farnsworth also misled investors by concealing that he controlled Vinco, including by acting through officers and directors he handpicked to carry out his directives.

7. During the Relevant Period, Vinco raised over $120 million through securities offerings, while Farnsworth extracted millions of dollars from the company in financial benefits for himself.

8. Since peaking at a price of $12.49 per share in September 2021, Vinco's stock price has dwindled to just fractions of a penny, leaving investors with substantial financial losses.

## VIOLATIONS

9. By virtue of the foregoing conduct and as alleged further herein, Defendant has violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

10. Unless Defendant is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

11. The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

12. The Commission seeks a final judgment: (a) permanently enjoining Defendant from violating the federal securities laws and rules this Complaint alleges he has violated; (b) ordering Defendant to disgorge all ill-gotten gains he received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Defendant to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Defendant from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file

reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

14. Defendant, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

15. Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. Defendant transacted business in the Southern District of New York and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District. For example, Vinco's securities were traded by, and offered and sold to, individuals and entities who resided in or were located in Manhattan.

## DEFENDANT

16. **Farnsworth,** age 62, was the co-founder, chairman, and controlling stockholder of Zash and a member of the Board of Managers of ZVV Media Partners LLC ("ZVV"), and briefly served as the co-CEO of Vinco. During the Relevant Period, Farnsworth controlled Vinco even when he did not have a publicly disclosed title or role. Farnsworth is a defendant in *SEC v. Farnsworth, et al.*, 22 Civ. 8226 (KPF) (S.D.N.Y. filed Sept. 26, 2022, amended Oct. 6, 2023), in which the Commission alleged, among other things, that he disseminated materially false or misleading statements to the public while serving as the Chairman and CEO of Helios

4

and Matheson Analytics Inc. ("HMNY"), the parent company to MoviePass, Inc., ("MoviePass"), a movie subscription service. In November 2022, the Department of Justice filed a criminal indictment against Farnsworth and a co-defendant, based on their conduct at HMNY/MoviePass. That criminal matter is currently pending in the U.S. District Court for the Southern District of Florida.

## OTHER RELEVANT ENTITIES

17. **Vinco** is a Nevada corporation formed in 2017, which is currently in default status with the Nevada Secretary of State. During the Relevant Period, Vinco had an office in East Syracuse, New York. Vinco's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act. Until October 2023, Vinco's stock traded on the NASDAQ. Since then, it has been quoted on OTC Link, operated by OTC Markets Group Inc., under the ticker symbol "BBIG."

18. **Zash** is a Delaware corporation headquartered in East Syracuse, New York. Farnsworth founded Zash in or around December 2020 and has controlled the company since that time as Chairman of the Board of Directors. During the Relevant Period, Zash described itself as "an evolved network of synergetic companies working together to disrupt the media and entertainment industry as we know it today."

## FACTS

**I.    FARNSWORTH SECRETLY ASSUMES CONTROL OF VINCO.**

19. In or around December 2020, Farnsworth formed Zash to serve as a holding company for media assets he planned to acquire in an attempt to create a "disruptive" media and entertainment business.

20. In December 2020, Farnsworth knew that the Department of Justice and the

Commission were conducting investigations concerning his conduct at HMNY/MoviePass.

21. Farnsworth purportedly intended to merge Vinco, a public company, into Zash, with Zash as the surviving entity.

22. One way that Farnsworth assumed control over Vinco was by installing as executives and directors of the company certain individuals with whom he had close personal and/or professional relationships.

23. For example, no later than September 2021, Farnsworth had selected as Vinco's Executive Chairman a person with whom he has had a decades-long personal and professional relationship, who relied on Farnsworth financially, and who Farnsworth understood would take direction from him.

24. Farnsworth did not take a public-facing role at Vinco himself because he knew that the Department of Justice and the Commission were already investigating his conduct in connection with HMNY/MoviePass and he did not want them to train their sights on Vinco.

25. Once Farnsworth had been publicly charged by the Commission and criminal authorities , he understood that disclosing that he was controlling Vinco would make the company less attractive to investors.

26. Accordingly, in its filings, Vinco identified Farnsworth's hand-selected individuals along with others, as the executives who were running Vinco.[1]

27. These filings were materially false or misleading because, in fact, Farnsworth ran Vinco by issuing instructions to the nominal executives.

---

[1] Such filings include at least Vinco's Forms 8-K filed with the Commission on January 21, 2021; February 23, 2021; July 23, 2021; July 14, 2022; July 22, 2022; and February 6, 2023; Forms 10-Q filed with the Commission on November 22, 2021; May 23, 2022; February 21, 2023; and April 10, 2023; Form 10-K filed with the Commission on April 15, 2022; and Schedules 14A filed with the Commission on March 9, 2023 and March 31, 2023.

28.     Farnsworth also generally controlled Vinco's statements to the public, including in press releases that were attached to the company's filings with the Commission.

## II.     FARNSWORTH MAKES, AUTHORIZES, AND/OR DISSEMINATES FALSE AND MISLEADING STATEMENTS ABOUT THE VINCO/ZASH MERGER.

29.     On January 21, 2021, Vinco and Zash issued a joint press release announcing that they had executed an Agreement to Complete a Plan of Merger, and that Vinco and Zash had created a joint venture, ZVV, to pool certain assets in advance of the merger. The press release was attached to a Form 8-K filed with the Commission. Farnsworth drafted, reviewed, and approved the January 2021 press release and authorized the filing of the Form 8-K.

30.     According to the January 2021 press release, the merger would combine Vinco's proprietary platform with Zash's state-of-the-art analytics and distribution technology to create an ecosystem of companies that would produce, distribute, and monetize digital media content.

31.     In fact, however, this statement was false or misleading because the companies lacked both the proprietary platform and the analytics and distribution technology that were described as bases for the supposedly monetizable Vinco ecosystem.

32.     By virtue of his roles at and involvement in the entities and their transactions/acquisitions, Farnsworth knew or recklessly disregarded that the companies did not have any proprietary platforms or state-of-the-art technology.

## III.    FARNSWORTH MISREPRESENTS LOMOTIF'S APP QUALITY AND USER BASE.

33.     On February 23, 2021, Vinco and Zash issued a joint press release, which Farnsworth drafted, reviewed, and approved, announcing that Zash would acquire a majority controlling interest in Lomotif (the "February 2021 Press Release").

34.     On July 23, 2021, Vinco and Zash issued a joint press release announcing the

7

completion of Zash's acquisition of Lomotif, a Singapore entity that purported to be a video-sharing social networking platform (the "July 2021 Press Release"). Farnsworth drafted, reviewed, and approved the July 2021 Press Release.

35. On or about August 20, 2021, Farnsworth took part in a recorded interview, published on an online media outlet, during which Farnsworth made statements concerning the growth of Lomotif's user base (the "August 2021 Interview").

36. The February 2021 Press Release, July 2021 Press Release, and August 2021 Interview all contained materially false or misleading statements.

37. For example, in the February 2021 Press Release, Farnsworth praised Lomotif as "the key piece of the ZASH strategy to merge the best-in-class media, entertainment and content-focused technology companies," and he described Lomotif as a platform with "unique and innovative" features that they would expand in the U.S. and globally.

38. However, Farnsworth's statement that the Lomotif app was "best-in-class" was, at minimum, misleading because, as Farnsworth was aware, the app had received predominantly bad reviews and low ratings from users.

39. Additionally, the February 2021 Press Release stated, "ZASH believes that Lomotif is one of the fastest growing video-sharing social networking platforms in its category over the last three years and in Asia, Europe and South America, Lomotif has increased its average monthly community by over 400 percent in this time span." Farnsworth also touted Lomotif as having a "dominant, global user traction and reach."

40. In fact, contrary to these representations, as of February 2021, Lomotif's user base was not experiencing a period of protracted growth, but rather was in a period of decline.

41. Farnsworth knew or was reckless in not knowing that Lomotif's user base was

declining, because he had received information concerning Lomotif's internal user base in connection with the acquisition of Lomotif. He also knew that the user base was a critical metric reflecting whether Lomotif could be successfully monetized, and that Lomotif's valuation was based upon the number of monthly average users ("MAUs") and the amount of revenue that was expected to be earned by each MAU.

42. The July 2021 Press Release falsely touted that Lomotif had "tens of millions of monthly users . . . and over 31 million on-platform monthly active users." In fact, the actual number of users was far less.

43. During the August 2021 Interview, Farnsworth again touted Lomotif's growing user base, falsely stating that Lomotif's MAUs had more than doubled since Vinco took over and were growing every month, and that Vinco/Zash were "knocking it out of the park" with respect to the growth of Lomotif's user base.

44. Farnsworth knew or was reckless in not knowing that the statements concerning the growing user base in the July 2021 Press Release and the August 2021 Interview were false or misleading because of his familiarity with Lomotif's internal data on users.

IV. **FARNSWORTH MISREPRESENTS THAT LOMOTIF AND ADRIZER ARE OPERATING BUSINESSES.**

45. On October 7, 2021, Vinco and Zash issued a joint press release announcing that their joint venture, ZVV, had signed a binding letter of intent to acquire AdRizer, a social media advertising company (the "October 2021 Press Release"). The press release described AdRizer as using "A.I." on its "proprietary platform" and stated that AdRizer would be integrated into the Lomotif platform for ad placement revenue. Farnsworth was quoted in the press release as stating, "This is an exciting time for us as we move forward with our strategy for building out a full platform on a short form video app like Lomotif. We will now be able to monetize within

our own internal platform." Farnsworth drafted, reviewed, and approved the October 2021 Press Release.

46. Both AdRizer and Lomotif were key pieces in the Vinco ecosystem that Farnsworth promised Vinco investors.

47. Consistent with this narrative, Vinco's Forms 10-Q for the second and third quarters of 2022, filed in February and April 2023, respectively, continued to reference Vinco's "strategy" to "expand[ ] Lomotif's reach" and stated that Vinco was "developing means to monetize the content creation and streaming capabilities of the Lomotif platform." These filings also stated that "AdRizer is anticipated to generate advertising revenue through ad placements in the Lomotif app and on Lomotif websites based on traffic, views, and impressions."

48. However, as Farnsworth knew or recklessly disregarded, there were not sufficient Lomotif users to yield material advertising revenue.

49. Farnsworth reviewed and approved the statements contained in the Forms 10-Q for the second and third quarters of 2022.

50. On April 17, 2023, at Farnsworth's direction, the Executive Chairman of Vinco issued a letter to shareholders that was attached to a Form 8-K that Vinco filed with the Commission. Farnsworth drafted, reviewed, and approved the April 17, 2023 shareholder letter.

51. The letter described Lomotif and AdRizer as if they were operational synergetic businesses and described how Vinco planned to integrate assets from an upcoming acquisition "into the Vinco system" to "boost revenue and profitability" at Lomotif and AdRizer, among other companies.

52. On or about April 25, 2023, Vinco's board of directors issued a second letter to shareholders, which was attached to a Form 8-K that Vinco filed with the Commission.

Farnsworth reviewed, and approved the April 25, 2023 shareholder letter.

53. The letter stated that "Vinco is shifting its focus from addressing legacy challenges to executing against future growth."

54. Contrary to statements in the Forms 10-Q for the second and third quarters of 2022 and the April 17, 2023 and April 25, 2023 letters to shareholders describing Lomotif and AdRizer as if they were actively operating companies, both companies had, by the time of these statements, ceased normal operations due to insufficient funding.

55. At the time the Form 10-Q for the third quarter 2022 was filed, Farnsworth knew that Vinco was still experiencing "legacy challenges" including that both Lomotif and AdRizer did not have sufficient funding to operate and, as a result, could not monetize the new content.

56. Since approximately February 2021, Lomotif had been operating solely through cash infusions from Vinco. However, by at least February 2023, Vinco no longer had the means to fund Lomotif's business, and Lomotif was preparing to shut down operations completely.

57. Indeed, by at least February 2023, Farnsworth had directed Vinco's personnel to instruct Lomotif to eliminate cash consumption and to pay only those bills that would forestall the app's feed from being cut or would change the look of the app, which a Vinco executive referred to as the "shareholder forward-facing part of the app."

58. By early April 2023, all of Lomotif's employees had been furloughed with the exception of three engineers who were working at reduced capacities and who—consistent with Farnsworth's instructions—were only focused on keeping the app feed and view operational. All functions deemed "not essential" were cut, including content moderation, user support, app updates, and bug fixes.

59. Farnsworth knew or was reckless in not knowing that AdRizer was also

experiencing significant financial challenges by January 2023, including because Vinco had failed to provide promised working capital for AdRizer's operations. Instead, Vinco directed AdRizer to wire money to fund Vinco's own bank accounts in December 2022 and April 2023.

60. Farnsworth also knew that by no later than February 2023, AdRizer personnel, including its CEO, expressed concerns about Vinco's financial condition and ability to fund AdRizer.

61. AdRizer's CFO resigned in March 2023, and in early April 2023 AdRizer's CEO expressed his intent to resign given, among other things, that the company did not have the necessary money to operate the business and that Vinco had control over AdRizer's bank account.

62. At the time of the April 25, 2023 shareholder letter, Farnsworth also knew that Lomotif was not developing the means to monetize the content creation and streaming capabilities of the Lomotif platform; to the contrary, Lomotif had furloughed nearly all of its employees and suspended some of the app's most important functions due to insufficient funding.

V. **FARNSWORTH PROFITS FROM HIS FRAUD WHILE INVESTORS INCUR LOSSES.**

63. Throughout the Relevant Period, Farnsworth used his control over Vinco to direct payments to benefit himself and other companies that he controlled.

64. For example, Vinco made millions of dollars in purported "business" loans to entities controlled by Farnsworth, which Farnsworth had no intention of repaying.

65. Vinco later recorded an allowance for loan losses after determining that certain of the loans to Farnsworth's entities were not recoverable and were unlikely to be repaid.

66. Farnsworth also received salaries, fees and commissions and "reimbursements" of

personal expenses from Vinco that were disguised as business expenses.

67. For example, in or around February 2022, an entity that Farnsworth controlled received a payment of millions of dollars in connection with Vinco's acquisition of AdRizer.

68. Farnsworth used this money to pay for, among other things, personal expenses, including travel expenses, luxury vehicles, and home renovations.

69. Additionally, beginning in December 2022, Vinco paid Farnsworth an annual salary of $340,000 as its Chief Strategy Officer, making Farnsworth one of Vinco's most highly compensated executives.

70. Although Vinco identified in its Commission filings that Farnsworth held certain roles with entities affiliated with Vinco, the filings did not identify Farnsworth's role as Chief Strategy Officer of Vinco itself, nor did they disclose the value of all the payments that Vinco made to Farnsworth, whether directly or indirectly through persons and entities controlled by Farnsworth.

71. Meanwhile, Vinco investors incurred substantial losses. The planned merger between Vinco and Zash never closed and, as of the date of this Complaint, the company's stock is trading at a fraction of a penny per share.

**FIRST CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)**

72. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 71.

73. Defendant, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly has employed one or more devices, schemes, or artifices to defraud, (2) knowingly, recklessly, or negligently has obtained money or

property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

74. By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

75. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 71.

76. Defendant, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

77. By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining Defendant and his agents, servants, employees, and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Ordering Defendant to disgorge all ill-gotten gains he received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

**III.**

Ordering Defendant to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

**IV.**

Permanently prohibiting Defendant from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and

**V.**

Granting any other and further relief this Court may deem just and proper.

## JURY DEMAND

The Commission demands a trial by jury.

Dated: New York, New York
December 23, 2024

                                                */s/ Antonia M. Apps*
                                                ANTONIA M. APPS
                                                REGIONAL DIRECTOR
                                                Thomas P. Smith, Jr.
                                                Alison T. Conn
                                                Travis Hill
                                                Elizabeth Butler
                                                Tiantong Wen
                                                Attorneys for Plaintiff
                                                SECURITIES AND EXCHANGE COMMISSION
                                                New York Regional Office
                                                100 Pearl Street
                                                Suite 20-100
                                                New York, NY 10004-2616
                                                (212) 336-9135 (Hill)
                                                HillTr@sec.gov